FILED BY_____ D.C

02 FEB 27 AM 11:51

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FL - MIAMI

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 01-4572-CIV-MOORE

Magistrate Judge O'Sullivan

FOUR SEASONS HOTELS AND RESORTS
B.V., FOUR SEASONS HOTELS (BARBADOS)
LTD., and FOUR SEASONS HOTELS LIMITED,

        Plaintiffs,

vs.

CONSORCIO BARR, S.A., and CARLOS L. BARRERA,

        Defendants.

_____/

### PLAINTIFFS' EMERGENCY MOTION FOR CONTEMPT
### OF PRELIMINARY INJUNCTION ORDER
### AND MEMORANDUM OF LAW IN SUPPORT

Plaintiffs hereby move, on an emergency basis, for entry of an Order holding

Defendants in contempt for deliberately and egregiously violating this Court's November

15, 2001 Preliminary Injunction Order (Docket No. 9).   In support hereof, Plaintiffs

submit the Declaration of Dr. Jozel Venegas, filed contemporaneously herewith.

### PROCEDURAL BACKGROUND

This action was filed by Plaintiffs (hereinafter collectively the "Four Seasons") on

November 6, 2001 alleging, *inter alia*, violations of the Computer Fraud and Abuse Act,

18 U.S.C. § 1030, and misappropriation of trade secrets.   On November 15, 2001,

following an evidentiary hearing held the previous day, this Court entered a Preliminary

Injunction enjoining and restraining Defendants from:

1.  Accessing or attempting to access Plaintiffs computer network and electronic mail systems;

2.  Obtaining, disclosing or using any information or data accessible through Plaintiffs computer network and electronic mail systems;

3.  Denying Plaintiffs access to any computer connected to Plaintiffs computer network systems.  *See* Preliminary Injunction, pp. 5-6.  A true and correct copy of the Preliminary Injunction is attached hereto as Exhibit A for the Court's convenience.

Additionally, this Court further ordered that:

1.  The Defendants shall return to the custody and control of the Plaintiffs within forty eight hours of this Order, the backbone (3 Com Switch), the Open Reach Server and the workstation (alleged to be taken by Mr. Bencomo).

2.  Defendants shall return immediately any information or compilation obtained through access to Plaintiffs' computer systems.  *Id*.[1]

Subsequently, on November 19, 2001, Defendants filed an emergency motion to dissolve, modify and/or stay the injunction.  After a hearing held on November 21, 2001, this Court denied Defendants' motion.  (Docket No. 12).  Bond as required by the Preliminary Injunction was posted by the Four Seasons on November 21, 2001.  (Docket No.16).

Defendants appealed the Preliminary Injunction that same day, November 21, 2001.  (Docket No. 18).  Defendants then filed a motion in the Court of Appeals for the Eleventh Circuit for a stay of the injunction.  On January 8, 2002, the Court of Appeals

---

[1]    At the close of the Preliminary Injunction hearing, this Court (Judge Middlebrooks presiding) cautioned Defendants that it would seek to enforce the injunction order.  *See* Hearing Transcript, pp. 61-62. A true and correct copy of the Hearing Transcript is attached hereto as Exhibit C.

denied Defendants' motion for a stay. (A true and correct copy of the Court of Appeals ruling is attached hereto as Exhibit B.)

Notwithstanding that the Preliminary Injunction has been in effect since November 15, 2001, and notwithstanding that both this Court and the Court of Appeals refused to stay the injunction pending appeal, Defendants have proceeded to completely disregard and disobey the Preliminary Injunction, and indeed have acted as if the injunction does not exist. As set forth below and in the accompanying Affidavit of Dr. Jozel Venegas, Defendants have deliberately violated each and every aspect of the Preliminary Injunction. In view of the severity of Defendants' actions, the Four Seasons seeks expedited enforcement of the Preliminary Injunction and sanctions appropriate under these circumstances.

## DEFENDANTS' WILLFUL ACTS OF CONTEMPT

Less than one week ago, on February 22, 2002, Defendants stormed into the Systems Room of the Four Seasons Hotel in Caracas, **by force**, where a variety of Four Seasons computer servers are located. (Venegas Declaration, ¶ 6). During their raid, in which two Four Seasons employees were physically battered, Defendants copied onto tapes the entirety of the Four Seasons proprietary and confidential financial and guest history information databases.[2] (Venegas Declaration, ¶¶ 6-10). These databases constitute the exact information designed to be protected by the Preliminary Injunction entered by this Court on November 15, 2001. By way of illustration, the information that

---

[2]      Defendants' forced entry into the Systems Room of the hotel was purportedly authorized by an *ex parte* order of a Venezuelan court. Though the Four Seasons has engaged counsel in Venezuela to represent it in any such proceedings there, at the time of this filing undersigned counsel has not seen a copy of the purported Venezuelan order and is unaware of its contents. However, on information conveyed from the Four Seasons' Venezuelan counsel, Defendants failed to inform the Venezuelan court of the pendency of this action and of the existence of this Court's Preliminary Injunction.

Defendants illegally obtained and copied includes the names, addresses, credit cards, and credit histories of more than one million guests of the Four Seasons hotels worldwide over the past ten years, as well as what those guests purchased, how long they stayed, what they ordered from room service, and what telephone calls they placed.   This information thus represents the Four Seasons' proprietary customer list on a worldwide scale. (Venegas Declaration, ¶ 8).  Additionally, Defendants copied files from the Four Seasons computer servers containing internal financial and accounting records of the Four Seasons, and a host of other confidential information.  (Venegas Declaration, ¶ 7). As is plain, any use or disclosure of this information by the Defendants would have a severe adverse impact on the Four Seasons business and operations worldwide.  In fact, the loss of exclusivity of this information already threatens to have caused irreparable harm on an enormous scale.

Additionally, in blatant disregard of the Preliminary Injunction, and despite numerous requests for compliance by Plaintiffs, Defendants have failed to return the computer equipment ordered to be returned in the Preliminary Injunction, and using that equipment have attempted to access the Four Seasons computer network at various times since the injunction was first entered.  (Venegas Declaration, ¶¶ 4-5).

Accordingly, Defendants have deliberately violated and failed to comply with each and every aspect of this Court's November 15, 2001 Preliminary Injunction, to wit: (1) Defendants have continued to access and attempted to access the Four Seasons computer network; (2) Defendants have illegally obtained – and electronically copied -- extremely confidential and proprietary information from the Four Seasons computer network; (3) Defendants have denied the Four Seasons access to the computer equipment

previously ordered to be returned; (4) Defendants have failed to return the computer equipment as ordered by the Court; and (5) Defendants have failed to return any of the data and information that they illegally obtained and copied from the Four Seasons computer network.

## APPLICABLE LAW

This Court's power to enforce compliance with its orders is inherent. *Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1301 (11th Cir. 1991). Generally, the refusal to do an act commanded is civil contempt, while doing a forbidden act is criminal contempt. *Popular Bank of Florida v. Banco Popular de Puerto Rico*, 180 F.R.D. 461, 465 (S.D. Fla. 1998).

To prevail on this motion, the Four Seasons must demonstrate by clear and convincing evidence that the Defendants have violated an outstanding court order. *Commodity Futures Trading Commission v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992). Even though the acts complained of herein are willful, it is well settled that a violation of an order need not be willful for a party to be found in civil contempt. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949). Moreover, a party is not free to defy an injunction order based on its belief, no matter how sincere, that the order is invalid. *Levine v. Comcoa Ltd.*, 70 F.3d 1191, 1194 (11th Cir. 1995).

Furthermore, it is well settled that a Court has power to punish contemptuous acts committed beyond the Court's territorial jurisdiction. *Sullivan v. United States*, 4. F2d 100 (8th Cir. 1925); *Binkley v. United States*, 282 F. 244, 246 (8th Cir. 1922); *Tilghman v. Tilghman*, 57 F. Supp. 417, 418 (D.D.C. 1944).

As for remedies, the Eleventh Circuit has made clear that "[d]istrict courts have broad discretion in fashioning civil contempt sanctions." *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1519 (11th Cir. 1990).  Generally, sanctions in civil contempt serve two purposes: (1) to coerce the defendant into compliance with the Court's order; and (2) to compensate the complainant for losses sustained as a result of the contumacious behavior. *United States v. United Mine Workers*, 330 U.S. 258, 303-04, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947).  In addition to compensatory damages and a fine to coerce compliance payable to the complainant, attorneys' fees and expenses may be awarded. *Sizzler Family Steak Houses v. Western Sizzlin Steak*, 793 F.2d 1529, 1534-35 (11th Cir. 1986).  Moreover, where a violation of a court order is willful, exemplary damages may be awarded. *Dow Chemical Co. v. Chemical Cleaning, Inc.*, 434 F.2d 1212, 1214-15 (5th Cir. 1970).  Finally, in appropriate cases, sanctions against civil contemnors may be as severe as incarceration in order to coerce compliance. *Commodity Futures Trading Commission*, 950 F.2d at 1529.[3]

## ARGUMENT

In this case, this Court issued its Preliminary Injunction on November 15, 2001. The injunction order, based on the Four Seasons' claims under the federal Computer Fraud and Abuse Act, clearly and unambiguously prohibited the Defendants from accessing the Four Seasons computers, and from obtaining any of the Four Seasons confidential and proprietary information.   The injunction order also clearly and unambiguously required Defendants to return three (3) specific items of computer

---

[3]     Separately, the Court's power to hold a defendant in criminal contempt for disobeying an order arises under 18 U.S.C. § 401. *See also United States v. Cable News Network, Inc.*, 865 F. Supp. 1549, 1552 (S.D. Fla. 1994).

equipment to the Four Seasons, and any data or information obtained by Defendants from the Four Seasons computer network.

The testimony and supporting exhibits of Dr. Jozel Venegas demonstrate that Defendants have violated **all** of the requirements of the Preliminary Injunction. Indeed, Defendants' violations have been deliberate and egregious, and accompanied by violence. Accordingly, the Four Seasons seeks expedited enforcement of the Preliminary Injunction and sanctions against Defendants, as follows:

(1)      A fine to be assessed against the Defendants and payable to the Four Seasons in the amount of $100,000 for each day the Defendants remain in violation of the Preliminary Injunction;

(2)      The striking of Defendants' pleadings and entry of judgment in favor of Plaintiffs and against Defendants;

(3)      An award of actual damages suffered by the Four Seasons due to the Defendants' violations of the Preliminary Injunction, including but not limited to the misappropriation of the Four Seasons financial and guest history information, as well as an award of exemplary damages, each in an amount to be determined by the Court;

(4)      An award of attorneys' fees and expenses incurred by the Four Seasons in seeking Defendants' compliance with the injunction;

(5)      Such other and further sanctions as the Court deems proper under these circumstances.

Respectfully submitted,

KILPATRICK STOCKTON, LLP


John C. Carey
Florida Bar No. 78379
200 South Biscayne Boulevard
Suite 2000
Miami, FL 33131-2310
(786) 777-8033 (telephone)
(786) 777-8001 (facsimile)
jcarey@kilpatrickstockton.com


**OF COUNSEL:**

RODRIGUEZ & MACHADO, P.A.
Juan J. Rodriguez
Florida Bar No. 0613843
1000 Brickell Avenue, Suite 660
Miami, FL 33131-3014
(305) 377-1000 (telephone)
(305) 377-1055 (facsimile)


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served by hand delivery to Edwin G. Torres, Esq., STEEL HECTOR & DAVIS LLP, Counsel for Defendants, 200 South Biscayne Boulevard, Miami, Florida 33131-2398, this 27th day of February, 2002.


John C. Carey

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

FILED by ____ D.C.

NOV 15 2001

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

FOUR SEASONS HOTELS AND RESORTS
B.V., FOUR SEASONS HOTELS (BARBADOS)
LTD., and FOUR SEASONS HOTELS LIMITED,

          Plaintiffs,                     Civil Action No. 01-4572

                                       Middlebrooks/Bandstra

vs.

CONSORCIO BARR, S.A., and
CARLOS L. BARRERA,

          Defendants.

---

## PRELIMINARY INJUNCTION

This Cause comes before the Court upon the Plaintiff's Emergency Motion for Ex Parte Temporary Restraining Order filed with the Court on November 6, 2001. The Court determined that the advisability of a preliminary injunction was necessary. A hearing was held on November 14, 2001 at which time the parties were afforded an opportunity to be heard and to present evidence.[1] The Plaintiffs seek to enjoin the Defendants' alleged illegal access to its computer systems based upon the Computer Fraud and Abuse Act,18 U.S.C. 1030(a)(4) and 1030(a)(2)(c), and the Florida Trade Secret Misappropriation Act, Fla. Stat. 688.001. The Court has reviewed the record and is fully advised in the premises. The Court finds that a preliminary injunction is warranted in this matter.

## FACTUAL BACKGROUND

Jozel Venegas, Ph.D is Director of Management Information Systems (MIS) for Four Seasons Hotels and Resorts. On October 5, 2001, Dr. Venegas went to the Four Seasons Hotel in Caracas, Venezuela to investigate problems originating at the Four Seasons Hotel Caracas regarding interception of intra-corporate e-mail which are used by Four Seasons Hotels

1

**EXHIBIT**

**A**

worldwide over its private network. (Affidavit of Dr. Jozel Venegas,  5).

Eduardo Bencomo was previously employed by Four Seasons Hotels and served as Assistant Manager of Information Systems. In or about July, 2001, Robert ("Bob") O Neill was transferred from the Four Seasons Hotel and Resort in San Francisco, California to the Four Seasons Hotel Caracas as head of security. Bob O Neill gave Eduardo Bencomo a CD-ROM containing the database for the e-mail systems for Four Seasons Hotels and other proprietary and confidential information of Four Seasons Hotel to install at the Four Seasons Hotel Caracas, enabling Bob O Neill to receive e-mails in Caracas. Eduardo Bencomo never returned the CD-ROM to Bob O Neill. (Affidavit of Dr. Jozel Venegas,  6).

Dr. Venegas learned that in August, 2001, five (5) executive planning committee members of Four Seasons Hotels reported that their e-mails had been read by someone else prior to their receipt. The e-mail violations were reported by the five (5) executive committee members on the same day. Dr. Venegas also learned that Rosa Boliver, MIS Manager at Four Seasons Hotel Caracas inspected Eduardo Bencomo s computer and found on its hard drive a series of computer hacker software programs. (Affidavit of Dr. Jozel Venegas,  8). Eduardo Bencomo s hard drive contained Lophcrack version 2.5, a computer program which by-passes user and password protections found on computers. Rosa Bolivar ran the Lophcrack program from Eduardo Bencomo s computer and found that it had been used to by-pass user and password protection on the Four Seasons Hotel s computer network. Rosa Bolivar s inspection of Eduardo Bencomo s computer revealed a program called NetBEUI which allows access between two separate networks at the same time. NetBEUI is expressly prohibited by Four Seasons Hotels. Rosa Bolivar confirmed that Eduardo Bencomo was using NetBEUI to allow Defendant Consorcio Barr, C.A. access to Four Seasons Hotels  computer network which contains proprietary and confidential information belonging to Four Seasons Hotels and Resorts. (Affidavit of Dr. Jozel Venegas,  8).

The network Eduardo Bencomo accessed from the Four Seasons Hotel Caracas provides access to the entire e-mail system of Four Seasons Hotels. The network Mr. Bencomo accessed provides access to the Micros software which is the point of sole software customized for and

used by Four Seasons Hotels worldwide and which is proprietary to Four Seasons Hotels. The network Mr. Bencomo accessed also provides access to the Fidelio software which is the front office software used by Four Seasons Hotels and is proprietary to Four Seasons Hotels. The network Eduardo Bencomo accessed provides access to the Boch Office software, a financial data software program created by Four Seasons Hotels.

Four Seasons Hotel Caracas terminated Mr. Bencomo; he was hired the next day by Defendant Consorcio Barr, C.A. Eduardo Bencomo remains employed by Defendant Consorcio Barr, C.A. Mr. Bencomo took with him a computer workstation with proprietary information and software belonging to Four Seasons. (Affidavit of Dr. Jozel Venegas, 8).

When he arrived in Caracas, Venezuela in October, Dr. Venegas requested access from Defendant Consorcio Barr, C.A. to the Communications Room containing the telephone system for the hotel and controlled by Defendant. The Communications Room also contains a switch box where all connections to Four Seasons Hotel computer network originates. Dr. Venegas was denied access to the Communications Room for three (3) days. When he was provided access, he noticed three (3) empty jacks on the switch box which appeared to have been disconnected during the previous three (3) days. The Communications Room also contained the Four Seasons computer server which provides access to the entire Four Seasons Hotels computer network. By accessing the Four Seasons network through the server located in the Communications Room, one can have access to Four Seasons sensitive and proprietary information, including guest histories for all guests who have stayed at the Four Seasons Hotels around the world, including the United States. Dr. Venegas immediately demanded that the Four Seasons server be moved to the Systems Room in the Four Seasons Hotel Caracas. (Affidavit of Dr. Jozel Venegas, 10). To this date, the Four Seasons server has not been moved to the Systems Room in the Four Seasons Hotel Caracas and remains in the Communications Room. (Affidavit of Dr. Jozel Venegas, 12).

The proprietary information contained on the Four Seasons Hotels network includes names, addresses, credit card information, spending habits and preferences for all guests staying at

3

any Four Seasons Hotel in the world. Dr. Venegas confirmed that Defendant Consorcio Barr,
C.A. had gained access to the Four Seasons Hotels network. Dr. Venegas confirmed that
Defendant Consorcio Barr, C.A. continues to attempt to access the Four Seasons Hotels network
without authorization. (Affidavit of Dr. Jozel Venegas, 12).

## LEGAL ANALYSIS

The Plaintiffs, seek to enjoin the defendants alleged illegal access to its computer systems
based upon the Computer Fraud and Abuse Act,18 U.S.C.   1030(a)(4) and 1030(a)(2)(c), and
the Florida Trade Secret Misappropriation Act, Fla. Stat. 688.001. Although the Computer Fraud
and Abuse Act is a criminal law, it provides for a civil action to obtain compensatory damages
and injunctive relief to any person who suffers damage or loss by reason of a violation of the
criminal provisions. 18 U.S.C.  1030(g).

To prevail on a motion for preliminary injunction, the plaintiff must establish 1) a
substantial likelihood of success on the merits, 2) that it would be irreparably harmed it the
injunction is denied, 3) the threatened injury to the plaintiff outweighs the damage the injunction
may cause to the alleged infringer, and 4) that the Court s issuance of the injunction would not be
adverse to the public interest. *Davidoff v. PLD Int l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001);
*McDonald s Corp., v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998).

The plaintiffs have demonstrated a substantial likelihood of success on the merits. Under
the Computer Fraud and Abuse Act,18 U.S.C.   1030(a)(4), Four Seasons must show that the
defendants knowingly and with the intent to defraud accessed their computer without
authorization or exceeded their authorized access and obtained information of value. Under
section 1030(a)(2)(c), Four Seasons must establish that the defendants intentionally accessed the
computer without authorization (or exceeded their authorization) and obtained information where
the conduct involved interstate or foreign commerce. Four Seasons provided evidence that the
defendants exceeded their authority to the information. Dr. Venegas testified that he detected the
defendants computers accessing the Four Seasons systems.

To prevail on its claim for trade secret misappropriation, the Plaintiffs must demonstrate
first that the information it seeks to protect is indeed a trade secret and that they have taken

4

reasonable steps to protect the information. *American Red Cross v. Palm Beach Blood Bank*, 143 F.3d 1407, 1410 (11th Cir. 1998)(discussing the Florida trade secret provisions). A trade secret consists of information that 1) "derives economic value from not being readily ascertainable by others" and 2) "is the subject of reasonable efforts to maintain its secrecy." *Id.* Four Seasons must also establish that its trade secret was misappropriated by either a person who knew (or had reason to know) that it was improperly obtained or by a person who used improper means to obtain the information. *Del Monte Fresh Produce Co.v. Dole Food Company, Inc.*, 136 F.Supp.2d 1271, 1291 (S.D.Fl. 2001); Fla Stat. 688.002 (definition of misappropriation). Dr. Venegas testified that the Four Seasons computer system and proprietary programs are closely guarded and password protected. The customer lists and confidential business information are protected as trade secrets under Florida law. *Kavanaugh v. Stump*, 592 So.2d 1231 (Fla. App. 5th Dist. 1992).

The plaintiffs have also presented evidence to satisfy the other factors of the preliminary injunction. The plaintiffs presented evidence that they were irreparably harmed due to the loss of important client information. The balance of harms also weighs in the favor of the plaintiffs; the defendants have no entitlement to plaintiff's proprietary information. Finally, the federal statute clearly indicates that the prevention of the unauthorized access to such information is within the public interest.

It is hereby,

**ORDERED AND ADJUDGED** that

The Defendant Consorcio Barr, S.A. and its parents, subsidiaries, affiliates, officers, directors, agents, employees, attorneys, and all those in active concert or participation with them, are hereby preliminarily enjoined and restrained from engaging in any of the following acts:

1. Accessing or attempting to access Plaintiffs computer network and electronic mail systems;

2. Obtaining, disclosing or using any information or data accessible through Plaintiffs computer network and electronic mail systems;

3. Denying Plaintiffs access to any computer connected to Plaintiffs computer

5

network systems.

It is further ORDERED AND ADJUDGED as follows:

    1. The Defendants shall return to the custody and control of the Plaintiffs within forty-eight hours of this Order, the backbone (3 Com Switch), the Open Reach Server and the workstation (alleged to be taken by Mr. Bencomo).

    2. Defendants shall return immediately any information or compilation obtained through access to Plaintiffs' computer systems.

    3. Bond is set at $30,000 to be filed with the Clerk of the Court.

    DONE AND ORDERED in Chambers at Miami, Florida, this _15_ day of November 2001.

                        DONALD M. MIDDLEBROOKS
                        UNITED STATES DISTRICT JUDGE

Copies to Counsel of Record

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

JAN - 8 2002

THOMAS K. KAHN
CLERK

_____

No. 01-16588-II
_____

FOUR SEASONS HOTELS AND RESORTS, B.V.,
FOUR SEASONS HOTELS (BARBADOS), ET AL.,

Plaintiffs-Appellees,

versus

CONSORCIO BARR, S.A.,
CARLOS L. BARRERA,

Defendants-Appellants.
----------------------------
On Appeal from the United States District Court for the
Southern District of Florida
----------------------------

BEFORE: TJOFLAT, BIRCH and DUBINA, Circuit Judges.

BY THE COURT:

Appellants' motion for stay of the District Court's
preliminary injunction pending appeal is DENIED.

On its own motion, the Court expedites this appeal for
merits consideration upon completion of briefing.  Appellees are
directed to provide notice to the District Court upon the filing
of their brief with this Court, and the District Court is
directed to transmit the record on appeal to this Court
immediately upon receipt of that notice.  The Court notes that,
should Appellants wish to further expedite this appeal, they may
do so by filing their brief at any time prior to the current
brief due date.

EXHIBIT
B

1

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                        MIAMI DIVISION

 3

 4   FOUR SEASONS HOTELS           )
     & RESORTS, B.V., et al.,      )    CASE NO. 01-4572-CIV
 5                                 )    Miami, Florida
                    Plaintiffs,    )    November 14, 2001
 6                                 )    5:30 o'clock, p.m.
                                   )
 7                                 )    Pages___ to____
                                   )
 8            vs.                  )
                                   )
 9   CONSORCIA BARR, S.A.,         )
     et al.,                       )
10                                 )
                    Defendant.     )
11   _____)

12

13        TRANSCRIPT OF MOTION FOR PRELIMINARY INJUNCTION
            BEFORE THE HONORABLE DONALD MIDDLEBROOKS,
14                UNITED STATES DISTRICT JUDGE

15

16   APPEARANCES:

17   For The Plaintiffs:        John C. Carey, Esq.
                                Kilpatrick Stockton, LLP
18                              200 South Biscayne Blvd.
                                Miami, Florida 33131
19                              -and-
                                Juan J. Rodriguez, Esq.
20                              Rodriguez & Machado
                                1000 Brickell Avenue
21                              Miami, Florida 33131

22   For The Defendants:        Robert Pittman, Esq.
                                Steel, Hector & Davis
23                              200 South Biscayne Blvd.
                                Miami, Florida 33131

24
     Court Reporter:            Roger Watford, RMR
25                              Official Court Reporter.
                                Miami, Florida
```

EXHIBIT

_C_____

2

```
 1            THE COURT:  This is the case of the Four
 2   Seasons Hotels versus Consorcia Barr, S.A., Case Number
 3   01-4572.  Could I please have appearances.
 4            MR. CAREY:  Good afternoon, Your Honor, John
 5   Carey for the plaintiffs.
 6            MR. RODRIGUEZ:  Good afternoon, Your Honor,
 7   Juan Rodriguez, Rodriguez & Machado, for the plaintiffs,
 8   and with me is Dr. Jozel Venegas, who is the director of
 9   MIS at the Four Seasons Hotels.
10            THE COURT:  Good afternoon.
11            MR. PITTMAN:  Robert Pittman, with Steel,
12   Hector & Davis.  I am making a limited appearance today
13   because we just heard of this action and we intend to
14   file motions attacking both the jurisdiction of this
15   Court and the service of process.
16            THE COURT:  All right, good afternoon.
17            Well, I set this hearing on an application for
18   preliminary relief, and a couple things come to mind by
19   the announcements.  I generally don't hear Steel Hector
20   cases.  I didn't know Mr. Pittman was going to come and
21   make a limited appearance.
22            On the other hand, I'm not crazy about
23   delaying a hearing.  Some of the allegations were such
24   that if there's evidentiary support for them I would be
25   inclined to grant you the relief.  The jurisdiction
```

1  issue is an interesting one.  Let me hear from the

2  plaintiffs on both those issues.

3       I, frankly, I was with Steel Hector when I

4  practiced law and practiced with them for a number of

5  years, it has been four and a half years now, I haven't

6  really come to a definite conclusion how long I was

7  going to adhere to that rule, but that is something you

8  should know.

9       One possibility would be to recuse, the case

10  would be reassigned then, and y'all could seek relief

11  from the new judge.  So that is something you need to

12  think about.  And I guess I'd like to hear from you

13  first on that issue because the only time I haven't done

14  it -- they have come in a couple of times in an

15  ancillary posture and particularly if it were lawyers

16  that I did not practice with.

17       Now, I did not practice with Mr. Pittman, but

18  there are other lawyers there that I did for a long

19  time, and I was a partner with those lawyers for a very

20  long time, and for that reason I generally have not

21  heard their cases.  So y'all need to address that

22  issue.

23       It's not a statutory impediment or a conflict,

24  but it has been my practice, and it's something y'all

25  need to think about.  Let me hear from you on that.  And

1    then, Mr. Pittman, you say a limited appearance, are you

2    prepared to argue jurisdiction?

3           MR. PITTMAN:   Your Honor, I heard about this

4    action yesterday around the close of business, so I have

5    not had an opportunity to prepare, but I would submit to

6    the Court that the jurisdictional issue should be

7    addressed before any temporary restraining order is

8    granted.

9           THE COURT:   Okay.   Let me hear from the

10   plaintiffs.

11          MR. CAREY:   Your Honor, John Carey for the

12   plaintiffs.   Plaintiffs would prefer to proceed with the

13   hearing as noticed.

14          Regarding the jurisdictional issues, we are

15   prepared to address the jurisdictional issues today.   We

16   believe that we have pled facts and are prepared to

17   argue the law on the point sufficient to demonstrate to

18   the Court that jurisdiction is proper, wherein it would

19   be the defendant's burden to carry the, you know, to

20   demonstrate that exercise of jurisdiction would be

21   unreasonable.

22          Preliminarily, we pled in the complaint that

23   defendants, the corporate defendant has consented to

24   jurisdiction, personal jurisdiction over it in this

25   forum.   That is, I would reference the Court to page 26

1  of Exhibit A to our complaint wherein, by contractual

2  agreement, consent to the courts located in Miami,

3  Florida was bargained for by the parties.

4       Separately, I would point out that the acts

5  that are being complained of by the plaintiffs committed

6  by the defendants were directed at least in part towards

7  this forum and; therefore, an exercise of specific

8  jurisdiction under International Shoe, Volkswagen,

9  Burger King and Asahe (phonetic) and their progeny is

10 appropriate.

11      And, lastly, we would point out to the Court,

12 as has been pled in the complaint, that the individual

13 defendant, Mr. Carlos Barrera, actually owns and

14 maintains a residence within this judicial district.

15      And we see no legitimate challenge to subject

16 matter jurisdiction.  The causes of action in the

17 complaint include violations of 18 U.S.C., Sections 1030

18 and 2511, as well as violations of the Landham Act and

19 related state law claims that are properly presented

20 under the Court's pendant jurisdiction.

21      THE COURT:  All right, thank you.

22      Mr. Pittman.

23      MR. PITTMAN:  Your Honor, of course, I'm at an

24 incredible disadvantage since again I just heard about

25 this action last night.  I don't have a complete set of

1    documents.   Opposing counsel did deliver to my office

2    this afternoon two inches of documents but I haven't had

3    an opportunity to review them.

4         From the few papers that I have received from

5    my client, specifically the agreement, Section 15.09, it

6    talks about jurisdiction, it says, "The parties hereto

7    irrevocably submit and consent to --"

8         THE COURT:   What page now?

9         MR. PITTMAN:   I don't know if my pagination

10   would agree with yours.   It's Section 15.09.   I don't

11   have the --

12        THE COURT:   Okay, I see it here.

13        MR. PITTMAN:   It says that, "The parties

14   hereto irrevocably submit and consent to the

15   nonexclusive jurisdiction of the Courts of the Republic

16   of Venezuela as regards any suit, action or legal

17   proceeding arising out of this agreement."

18        I have not studied this agreement, Your Honor,

19   and I don't pretend to make any representations as to

20   the proper construction of this agreement.   But I know

21   that there are issues both as to jurisdiction and

22   service of process.

23        I can tell you that service has not been

24   effectuated.   Venezuela is a signatore to the Hague

25   Convention on services of individuals abroad, although

1    it requires that any service require all documents be

2    translated into Spanish.  My clients, the defendants,

3    have told me that they were not served with Spanish

4    copies of these documents; therefore, service hasn't

5    been effectuated.

6            As to the personal jurisdiction of this Court

7    of the individual defendant, the fact that he has a,

8    owns a vacation home or some type of residence here,

9    does not in itself confer jurisdiction as the individual

10   resides permanently in Venezuela.

11           THE COURT:  Well, what about, I mean it would

12   seem like if somebody has gotten into or gets into

13   somebody's computer, even if they do it overseas, that

14   the computers are, I mean I guess some of them are

15   located here, I presume.

16           MR. CAREY:  Yes, Your Honor.

17           THE COURT:  Why wouldn't that be an act that

18   we could exercise jurisdiction over?

19           MR. PITTMAN:  Your Honor, it's difficult for

20   me to address.  I haven't had a chance to do any

21   research on this issue.  I haven't had a chance, for

22   example, to prepare affidavits.

23           I know that, from glancing at the TRO, that

24   there's representations in there that are not supported

25   by the facts as I know them.  For example, they refer to

1    the, a nonnamed defendant as having some program called

2    NetBEUI, which actually they refer to as a hacker

3    program, which actually resides on every Windows

4    computer in the world.  It's just a protocol.

5          And under their definition of hacker Your

6    Honor may be surprised to know that both yourself, with

7    all due respect, and myself, would both be considered

8    hackers.

9          They make other allegations about an IP log.

10   We never received the exhibits in the complaint in the

11   English versions that my clients received, which again

12   was inappropriate, and all that shows, anyone can change

13   their IP address, that is not a difficult feat.  Well, I

14   say anyone, having a little bit of experience with

15   computers, I know that it's very simple and we used to

16   do it in college, to play tricks on our friends, nothing

17   criminal of course, and it's, it doesn't show anything.

18         There's these allegations that we haven't had

19   an opportunity to rebut or prepare affidavits to defend

20   ourselves in, and, quite frankly, Your Honor, from

21   discussions I have had with my clients, the brief

22   discussions, it seems that they have been, quite

23   frankly, we believe that this is a pretext.

24         We have made demands on them that predate the

25   filing of this action to provide information, accounting

1   information, about their management of our hotels.  They

2   have refused to provide that information to us.  And now

3   we believe that they are filing this as a pretext to

4   create some appearance of impropriety on our part to

5   further deny us access to that financial information.

6         THE COURT:  Okay.  Well, I guess I could

7   understand that suspicion and a concern, but then what

8   they're asking that the defendants be enjoined from is

9   access to their computer.  You don't really have a right

10  to that in any event, so is there -- I have a hard time

11  seeing what the harm is with respect to the preliminary

12  relief.

13        I don't see how it -- I guess in a tactical

14  sense I understand the concern, but the injunction

15  itself would not harm someone who was not trying to get

16  into their computer, would it?

17        MR. PITTMAN:  Yes and no, Your Honor.  As a,

18  at one level obviously our client has no interest in

19  doing anything illegal, and I don't believe our client

20  is doing anything inappropriate.

21        However, the TRO, if you look at it, and again

22  I've only briefly looked at it, but in several places it

23  says that the defendants are not entitled to access to

24  the computer system, and then on another page, on page

25  13 the plaintiff admits that the defendant is authorized

1    to use the computer system per the parties' agreement

2    and specifically alleges that a status quo would be

3    maintained if the Court grants a TRO preventing the

4    defendants from exceeding their authorized use.

5            I don't know what the truth is.  I don't know

6    what the agreement says as to the scope of the

7    authorization.  But, quite frankly, I'm confused by the

8    TRO because at one point it says they are allowed access

9    and at another point it says they deny access.

10           To be honest, I don't know how this

11   proceeding, this creation of the TRO, will impact a

12   proceeding brought in Venezuela.  They have already --

13   my clients have provided notice of the inappropriate

14   conduct of the plaintiffs.  I don't know if they will

15   proceed with legal proceedings there.

16           But I certainly am fearful that if the Court

17   grants a TRO, and a TRO that we believe is not based on

18   facts, that this may somehow prejudice a proceeding that

19   is instituted in Venezuela.

20           THE COURT:  All right, thank you.

21           MR. CAREY:  May I rebut?

22           THE COURT:  Tell me, yeah, I'd like to hear

23   your response.  And also tell me how I'm going to

24   enforce this if I enter it.

25           MR. CAREY:  Yes, Judge.

1          First of all, actual notice of all of the

2     pleadings in this case were provided to the defendants

3     both last Friday and again this morning.  Service of

4     process has not been formally effectuated.  It is

5     imminent but it is not required as a predicate to a

6     preliminary injunction.

7          If the defendants have a meritorious defense

8     to jurisdiction, which we believe they do not, they are

9     free to move later and modify or dissolve the TRO or to

10    have the action dismissed.  But we have provided actual

11    notice of this hearing, of all of the pleadings in this

12    case, already to the defendants.

13         Additionally, regarding formal service of

14    process, I would point out to the Court, regardless of

15    the rules of the Hague Convention, the requirements of

16    Rule 4, the Federal Rules of Civil Procedure, can be

17    waived or modified by consent, and in this particular

18    case defendants have waived those requirements.

19         I would again refer the Honorable Court to

20    page 26 of the license agreement where at 11(a),

21    subparagraph 2, the defendants consent and designate

22    officers of themselves to accept service of process.  So

23    they have modified the obligations for formal service by

24    agreement.

25         I would further like to bring to the Court's

1  attention that we have pled and have submitted --

2          THE COURT:  Let me ask you about that.  You

3  pointed out paragraph 11.06, which seems to point to

4  trademarks or proprietary materials.  He points out

5  that -- I have forgotten which one it was, 15.09, wasn't

6  it?

7          MR. PITTMAN:  That's correct, Your Honor.

8          THE COURT:  -- which seems to talk about

9  Venezuela as a, some consent to the nonexclusive

10  jurisdiction of the Courts of Venezuela arising out of,

11  as regarding any suit arising out of this agreement.

12  How do you reconcile those two sections?  And is 11.06

13  specific only to trademark or some sort of proprietary

14  material issue?

15          MR. CAREY:  11.06 vests jurisdiction by

16  consent of the parties to Courts located in Miami,

17  Florida.  Paragraph 15.09(a) vests nonexclusive

18  jurisdiction to both parties to, in Venezuela.

19          So it appears, Your Honor, that the parties

20  have consented to jurisdiction in either Venezuela or

21  here.  Here related to trademarks and proprietary

22  materials.  So I don't think those are inconsistent.  I

23  think the parties have agreed here and bargained for

24  jurisdiction in either forum.  But 11.06 would clearly

25  satisfy the requirements of due process and support the

1  exercise of personal jurisdiction by this Court.

2        I would also like to bring to the Court's

3  attention that the computer hacking violations, there is

4  specific jurisdiction under general principles of

5  minimum contacts by virtue of the fact that the illegal

6  activity is directly giving rise to the cause of action,

7  the violation of 18 U.S.C., 1030, and 18 U.S.C., Section

8  2511. So there is a basis for personal jurisdiction

9  over the defendants as a result of those activities

10  directed towards this forum separate and apart from and

11  in addition to the contractual basis.

12        With respect to the merits of the claim, we've

13  put forth facts which make out a clear violation of the

14  computer fraud and abuse statute and we brought

15  Dr. Jozel Venegas to this hearing to demonstrate to the

16  Court that those actions have continued since the filing

17  of our compliant last week and our request for emergency

18  injunctive relief and he's prepared to testify to all

19  those matters today.

20        And, despite the arguments of counsel, I

21  haven't heard anything to rebut the allegations that we

22  have made and the proof that we have offered that

23  computer hacking is taking place by the defendants who

24  have no authorization whatsoever to access the Four

25  Seasons computer network, never had that authorization,

1   and are gaining access to corporate e-mail systems, to

2   the Four Seasons financial information, to Four Seasons

3   guest information, guest preferences, credit cards, all

4   of which is highly confidential, highly proprietary to

5   Four Seasons, and --

6        THE COURT:  What about, he said that they are

7   permitted to use your computer system in some respects,

8   is that the case or not?

9        MR. CAREY:  No, Your Honor.  The defendants

10  have never had permission to access Four Seasons'

11  computer network.

12       THE COURT:  There's some discussion in here

13  about a request to move the server into some systems

14  room from where it was.  I mean, why do they even have

15  the equipment if they are not entitled to have some

16  access to the computers?

17       MR. CAREY:  The defendants have owned the

18  property and had essentially confiscated a computer

19  terminal and have used that computer terminal with

20  hacker programs to access and illegally tap into the

21  Four Seasons network.

22       THE COURT:  Who would normally have been using

23  that computer?

24       MR. CAREY:  The Four Seasons employees who

25  manage the hotel, Your Honor.

1      THE COURT:  Okay.  So the people who work
2  there are your employees, they own it, is that the
3  situation?
4      MR. CAREY:  Yes.  And the defendants have
5  hired a former employee of the Four Seasons, of the
6  plaintiffs, who was part of the managing operation
7  there, and that employee was a technical employee who
8  did have, while he was working for the plaintiffs, did
9  have knowledge of passwords and so forth to get into the
10  system.
11      He's been terminated, he was hired by the
12  defendants, and is now using the knowledge he got as an
13  employee to assist the defendants into hacking into the
14  Four Seasons network.
15      THE COURT:  So I assumed -- I guess I
16  misunderstood.  I assumed they were operating this hotel
17  like a, you know, a franchisee and that y'all -- so the
18  employees who were there in Caracas work for the Four
19  Seasons?
20      MR. CAREY:  Yes.
21      THE COURT:  They own the site?
22      MR. CAREY:  Yes.
23      THE COURT:  The physical facility?
24      MR. CAREY:  Correct.
25      THE COURT:  But don't have employees.  So what

1    you are saying is they moved your computer somewhere

2    where it's not supposed to be, and through that this guy

3    that works for them is getting access to your system, is

4    that the --

5            MR. CAREY:  What they have done is, the

6    computer is in a communications room which is part of

7    the property, and they have locked that room and denied

8    Four Seasons managing, operating people, from getting

9    access and taking back that computer terminal.

10           THE COURT:  Well, then, and then if I were to

11   enter this injunction, how would I enforce it?

12           MR. CAREY:  Well, Your Honor, you have

13   jurisdiction over the defendants and any order that you

14   give they would be obliged to comply with.

15           THE COURT:  If they don't, what do I do?

16           MR. CAREY:  We would request Your Honor to

17   hold them in contempt.

18           THE COURT:  And they are all in Venezuela?

19           MR. CAREY:  Well, as we pointed out, the

20   defendant also resides here in this judicial district.

21           THE COURT:  Or has a vacation home, according

22   to their version at least.

23           MR. CAREY:  At least a vacation home, yes.

24           THE COURT:  Okay.  Well, let's --

25           MR. PITTMAN:  Your Honor, can I respond?

1          THE COURT:   Certainly.

2          MR. PITTMAN:   As far as the conflict between

3    the jurisdiction consents that applied in this

4    agreement, I would like to note that out of ten of the

5    counts I count five of them that don't have to do with

6    trademark or proprietary materials.

7          There's a breach of contract, there's computer

8    fraud and abuse, there's common law and fair

9    competition, I mean these aren't counts that are within

10   the scope of this specific grant and limited grant of

11   jurisdiction to this Court.  I still think we have some

12   big jurisdiction issues.

13         And as to the merits of what is happening and

14   not happening, Your Honor, I certainly would

15   respectfully request at least four or five days so I can

16   get affidavits to present my side of the case.  The

17   other side claims in a cavalier fashion that I haven't

18   refuted any of the facts.  I only found out about it

19   last night.

20         THE COURT:  Okay.  Well, I am going to go

21   ahead and hear their witness and you will get a chance

22   to cross-examine him.  I think with these, the nature of

23   these allegations, where if it is happening and if they

24   can make some sort of a showing of a, you know,

25   likelihood of success on the merits, an injunction ought

18

1   to issue, and probably as quickly as possible, because

2   essentially it's theft.

3          And it's -- I think you would have a chance to

4   come in and seek to dissolve it if necessary.  These are

5   the type of allegations which we in some circumstances

6   would go forward on a TRO.  We didn't do that.  We tried

7   to get at least some notice so that people could be

8   heard.  But I'm not prepared to delay it further.  And

9   so I do want to hear from the witness.

10         You couch this -- your findings of fact are

11  couched more in terms of me finding a violation.  I

12  question whether I am in a position to do that at a

13  preliminary basis.  Aren't we really still dealing with

14  the familiar test for an injunction that would be

15  likelihood of success on the merits as opposed to any

16  type of final conclusion that they have violated the

17  law?

18         MR. CAREY:  Yes, Your Honor.

19         THE COURT:  And what about his argument that

20  there's really an underlying dispute between the parties

21  and that y'all are refusing to give them some data and I

22  guess launching some sort of pre-emptive strike, what's,

23  let me hear a response to that argument.

24         MR. RODRIGUEZ:  Judge, Juan Rodriguez.  That

25  is not correct.  There is a hotel management agreement.

1    The hotel is owned by Consorcia Barr.  Four Seasons

2    Hotels is the operator and they are operating the

3    agreement pursuant to a hotel management agreement.

4    That hotel management agreement provides for arbitration

5    in Miami.

6         Consorcia Barr has been demanding from our

7    clients financial budgets, financial statements of the

8    hotel, and we have told them that we are in the process

9    of preparing it.  There are disputes with respect to

10   what type of information, not what type of the frequency

11   of the information that they are entitled to receive,

12   and that dispute, Judge, is subject to arbitration.

13        And this has nothing to do with -- that's a

14   separate agreement that's subject to arbitration, and we

15   are in the process of demanding arbitration before the

16   Triple A here in Miami.  That has nothing to do with

17   what we are here on, which is a hotel licensing

18   agreement, which deals with the licensing of the

19   trademark and proprietary materials, and the violation

20   of violating our proprietary materials, which is our

21   network.

22        THE COURT:  Why can't you -- isn't there a way

23   you can stop them from getting into the computer?

24        MR. RODRIGUEZ:  As Dr. Venegas will testify,

25   the answer to that is no.  Because what's happened is

20

1   that, assume for a moment that, I assume you have

2   computers in your office, if I locked you out of your

3   office you are wouldn't be able to stop me from just

4   plugging into your server and having access to your

5   information.  And that is what has happened.

6        There's a communications room at the hotel

7   which has the phone equipment, which has our server,

8   which has what's called a switch box, which is a hub

9   which, with telephone jacks, and that's where each of

10  the computers that are operating in the hotel are hooked

11  up to, but Consorcia Barr has locked us out of that

12  communications room.

13       And, as Dr. Venegas has testified in his

14  affidavit, he tried, the first thing he did when he got

15  to Caracas to address this problem is say, "I want

16  access to that communications room," and they wouldn't

17  give it to him.

18       And what he has testified to in his affidavit

19  and what he will testify to today is that he, using

20  special programs that allow you to remotely access a

21  server, he's been able to confirm, conclusively confirm,

22  that they are indeed hacking into the Four Seasons

23  network, which is a wide area network.

24       It is a network of computers that gives them

25  access to every single server that we have around the

21

1   world.  It gives them access to the Palm Beach hotel,

2   which is the supervising hotel, and where all the

3   supervisory responsibilities for the Caracas hotel lies.

4           THE COURT:  Okay.  Well, let's hear from your

5   witness.

6           MR. RODRIGUEZ:  The plaintiffs will call

7   Dr. Jozel Venegas.

8       **JOZEL VENEGAS**, PLAINTIFF'S WITNESS, SWORN

9                   DIRECT EXAMINATION

10  BY MR. RODRIGUEZ:

11  Q.   Good afternoon.  Could you please state your name

12  please for the record?

13  A.   Yes, Jozel Venezuela, J-O-Z-E-L V-E-N-E-G-A-S.

14  Q.   I call you Dr. Venegas, could you provide us real

15  briefly a educational background to your highest degree

16  of education?

17  A.   Yes.  I graduated from Pasadena College in 1989 and

18  I recently graduated or got a degree in computer science

19  in Atlanta, Georgia, Georgia Tech.

20  Q.   What was your degree from Pasadena College?

21  A.   Computer science, doctor, Ph.D.

22  Q.   That was at Georgia Tech?

23  A.   Yes.

24  Q.   So you have a Ph.D. in computer science from

25  Georgia Tech?

1  A.   That is correct.

2  Q.   What degree do you have from Pasadena College?

3  A.   Master's degree.

4  Q.   Dr. Venegas, what do you do for Four Seasons

5  Hotels?

6  A.   What I do for Four Seasons Hotels is I am part of

7  the operating, the management team, pre-opening team,

8  and what I do is basically make sure that I protect all

9  the interests for the ownership, and as well as Four

10  Seasons, applying all the security and making sure that

11  all networks are secured.

12  Q.   Do you have a title or a position with Four Seasons

13  Hotels?

14  A.   Yes.   I am the MIS director.

15  Q.   I want to be very brief, Dr. Venegas.   We filed and

16  you gave us an affidavit which is of record as of

17  November 5 of this year.   Since that time have you made

18  any investigations as to access by the defendants to the

19  Four Seasons network?

20  A.   Yes, I have.

21  Q.   What have you done?

22  A.   We used a program that is basically part of our

23  hardware, which is the three com switches that we have.

24  It comes included.   And we actually install the software

25  to be able to monitor all the network.   And since then

1    basically we monitored certain activity during night and

2    day and we have noticed different computers that don't

3    belong to us actually on the network at very bizarre

4    hours.

5    Q.    Do you use any -- did you use any other software to

6    monitor the access to the network?

7    A.    Yes, we use NetBEUI.

8    Q.    NetBEUI?

9    A.    NetBEUI.

10   Q.    What does NetBEUI do?

11   A.    It gives you a snapshot of all the computers that

12   are actually on the network at any time.

13   Q.    When you say a snapshot, what do you mean by a

14   snapshot?

15   A.    It gives you a complete diagram, if you would, of

16   all the networks with IP addresses and DNS in the entire

17   network.

18   Q.    And that would allow you to know what computers are

19   on the network at that time?

20   A.    Yes, it does.

21   Q.    Okay.  Before we get into that, Dr. Venegas, would

22   you please explain to the Court what type of information

23   is available at the Four Seasons network or in the Four

24   Seasons network, computer network?

25   A.    Yes.  There is the back office software, front

24

1   office --

2   Q.     What does that do?

3   A.     The back office software is basically everything

4   that has to do with the financials for Four Seasons

5   worldwide.

6   Q.     Who designed that program?

7   A.     That was designed by Four Seasons Hotels & Resorts

8   in Toronto.

9   Q.     What other information is available on the Four

10  Seasons network?

11  A.     We have a program called Fidelio, which is part of

12  the actual front office, if you would, and basically

13  maintains all the guest history worldwide for every

14  single client that we have in the world.

15  Q.     Could you elaborate more on that?  What does it

16  mean to have access to guest histories of Four Seasons

17  worldwide?

18  A.     Well, if you happen to have access to the guest

19  history, you would be able to see all of the personal

20  information of every guest, including all their,

21  obviously credit card information, and every preference

22  that they have, every time they have stayed, how much

23  money they spent, it's all in their profiles, which is

24  very valuable for Four Seasons.

25  Q.     How valuable is that information?

25

1   A.    Millions of dollars, probably.

2   Q.    Dr. Venegas, turning now to what you mentioned, the

3   snapshot, using the NetBEUI, when you -- have you taken

4   a snapshot of the Four Seasons network to determine what

5   computers are accessing it?

6   A.    Say that again please.

7   Q.    Have you taken a snapshot using the network

8   software that you described --

9   A.    Yes.

10  Q.    -- to determine what computers are accessing the

11  Four Seasons network?

12  A.    Yes.

13  Q.    Okay.  What did that snapshot show?

14  A.    The last time we ran it it showed that particular

15  diagram that we have right now.

16  Q.    First of all, you are pointing to a blowup.  Is

17  that the snapshot -- did you print that using the

18  network software?

19  A.    Yes, I did.

20  Q.    Okay.  Now, what, could you describe what that

21  snapshot -- when was that snapshot taken?

22  A.    That snapshot was taken on the 23rd.

23  Q.    Of October?

24  A.    Yes.

25  Q.    And what did it reveal to you?

1  A.    According to what I can see, basically I see all

2  the IP addressing of every single computer in our

3  network basically that don't belong to us.

4  Q.    So the computers that are on the snapshot are

5  computers that are accessing the network currently?

6  A.    Yes.

7  Q.    But are not, do not belong to the Four Seasons?

8  A.    That is correct.

9  Q.    And how can you conclude that?

10 A.    We have a specific naming conversion for all the

11 computer networks throughout the world in every property

12 that we go to.  In Caracas, for instance, it's CCS for

13 the naming.  And we use all the IP addressing.  Our IP

14 addressing starts with a 10 for every property.

15       The second frequency or number would be basically

16 the property, where it's located, and obviously those

17 don't belong to us.  As you can see, they have different

18 names.

19 Q.    Have you been -- looking at the snapshot, the IP

20 addresses start with 5.  Have you been able to confirm

21 to whom those IP addresses belong to?

22 A.    Yes.

23 Q.    Who?

24 A.    Consorcia Barr.

25 Q.    The defendant in this case?

27

1   A.   That is correct.

2   Q.   You also have seen the snapshot.  I take it that

3   the NetBEUI software --

4   A.   Yes.

5   Q.   -- also captures the name that has been provided

6   for the computer?

7   A.   Yes.

8   Q.   Do you recognize any names that are belonging to

9   the defendants?

10   A.   Yes.

11   Q.   Which ones?

12   A.   I can see El Tado (phonetic).

13   Q.   Who is El Tado?

14   A.   He is Carlos Barrera's brother.  And again I can

15   see Eduardo.

16   Q.   Who is Eduardo?

17   A.   He used to be our prior systems manager.  He was

18   terminated by the Four Seasons.

19   Q.   He is a former employee of Four Seasons that now

20   works for the defendant?

21   A.   Yes.

22   Q.   And we mentioned earlier that by accessing the Four

23   Seasons network they are gaining access to the Palm

24   Beach server.  Could you please describe for the Court

25   what is the relationship between the Palm Beach Four

28

1   Seasons and the Four Seasons in Caracas?

2   A.   Palm Beach is basically, has -- they oversee Four

3   Seasons Caracas, basically that's what they do.  It's a

4   regional property.  So they take care of a lot of

5   properties in South America.

6   Q.   So is it fair to say that Caracas reports its

7   financial information and that type of thing to the Palm

8   Beach Four Seasons?

9   A.   Yes, they do.

10   Q.   And what does Palm Beach Four Seasons do with that

11   information?

12   A.   That information is basically stored in different

13   file servers in each hub, if you would, you would call

14   it a hub, for every property that's in the region, and

15   that information is then utilized by the director of

16   finance and to do all the reporting to home office.

17   Q.   Is that information used to prepare financial

18   statements?

19   A.   Yes, it is.

20   Q.   And is Four Seasons a publicly traded company in

21   Canada?

22   A.   Yes.

23   Q.   How long have you been employed at Four Seasons,

24   Dr. Venegas?

25   A.   Three years.

29

1   Q.   How many hotels in the Four Seasons chain have you

2   been involved with as far as pre-opening activities and

3   securing of networks?

4   A.   At least in five or six properties.

5   Q.   Which ones, real briefly?

6   A.   Okay, Egypt, I just opened in Egypt, properties in

7   Egypt.  We just opened another property in Paris, in

8   France.

9   Q.   That's the D'orsok (phonetic)?

10  A.   That's correct.

11       We are opening San Francisco right now as we

12  speak.  Argentina.  And now we are going to be opening

13  in Uruguay.

14  Q.   Okay.

15       Does Consorcia Barr or any of its principals have

16  authorization from Four Seasons to have access to its

17  network?

18  A.   No, not at all.

19  Q.   To your knowledge, has Four Seasons ever given any

20  owner, any owner of any hotel that they manage, access

21  to their Four Seasons network?

22  A.   Never.

23  Q.   You also in your affidavit testified as to the fact

24  that you also worked at the Ritz Carlton I believe?

25  A.   ITT Sheraton, correct.

1   Q.    How long have you been in the hotel industry?

2   A.    For the last 15 years.

3   Q.    Have you ever heard or seen an owner having access

4   to computer networks of the hotel manager?

5   A.    No, actually not.  I have never seen that before

6   because we're the managing company so we take care of

7   their business.  That's why we are hired to do that.

8   Q.    Dr. Venegas, how long, and in your affidavit you

9   testify that you were commissioned, so to speak, to go

10  down to Caracas to address this problem, when did you

11  arrive in Caracas?

12  A.    October 5th.

13  Q.    How much time have you spent addressing this

14  computer hacking problem and trying to resolve it?

15  A.    I have been there for eight weeks actually.

16  Q.    I take it you are on a salary?

17  A.    Yes, I am.

18  Q.    So you are not being paid by the hour?

19  A.    No.

20  Q.    Do you know how much out-of-pocket expense in

21  addition to your time and your salary has Four Seasons

22  incurred in, with respect to this investigation and its

23  efforts to remediate this problem?

24  A.    Yes.

25  Q.    How much?

1   A.    More or less, it's not only me, actually I am using

2   all the resources to be able to support what I do to be

3   able to help Caracas at this point, so I would say it's

4   about fifteen thousand to twenty thousand dollars right

5   now.

6   Q.    Have you had to recruit other people to help you,

7   you know, make these diagnostic tests?

8   A.    No, actually not.  What has happened is that I had

9   to utilize other resources from other properties to take

10  care of my normal every day business, I suppose, what I

11  do.

12  Q.    Now, in your affidavit you mentioned the

13  communications room at the hotel.

14  A.    Yes.

15  Q.    Could you describe what's in that communications

16  room?

17  A.    Yes.  There's a file server that is called Open

18  View, which is our firewall, and there is also a

19  backbone, which is a switch, a three com switch, which

20  it actually has all the ability to have all the control

21  over the whole building, for all the hubs and switches

22  and everything that we have in the building at this

23  point.

24  Q.    And who controls or has physical control over that

25  room today?

32

1   A.   Consorcia Barr.

2   Q.   When you asked to -- did you ever ask to have

3   access to that room?

4   A.   Yes.

5   Q.   And what was their response?

6   A.   They didn't let me in.  They wouldn't let me in.

7   Q.   Have you asked Consorcia Barr to allow you to

8   retrieve your server?

9   A.   Yes, several times.

10  Q.   And what has been their response?

11  A.   No response.

12  Q.   Who owns that server that's in the communications

13  room that gives access to the worldwide network?

14  A.   The Four Seasons Hotels & Resorts.

15       MR. RODRIGUEZ:  May I confer with co-counsel?

16       THE COURT:  Yes.

17       (Pause)

18       MR. RODRIGUEZ:  Just a few more questions,

19  Dr. Venegas.

20  BY MR. RODRIGUEZ:

21  Q.   What protections have been put in place to protect

22  from unauthorized access to the Four Seasons network?

23  A.   One of them is Open Reach, which is part of the

24  firewall that we utilize worldwide at this point.  Every

25  property has one of them.  And, other than that piece of

 1    software or I mean hardware that we have or server, we

 2    have only been able to utilize software, because we

 3    don't have control over the backbone, which is kind of

 4    useless at this point.

 5    Q.    You mean you don't have control in this hotel?

 6    A.    Correct.  I don't have no control, no matter what I

 7    do at this point, if they continue, every time they plug

 8    in you can see them, so it's really difficult to do

 9    anything else.  We don't have no control over the room

10    and every time we request access we have been denied to

11    go in there.

12        Besides the fact that I have asked them so much at

13    this point, they don't really know me that well, but I

14    asked them plenty of times to allow me to relocate the

15    backbone into the systems office, which is where we

16    normally keep it.  I mean it's just better for the

17    company.  It's better for the systems manager in each

18    property to have the backbone and to be able to

19    troubleshoot it.  That is what -- that's why I have been

20    asking really to relocate that.

21        And also the Open Reach server, it's obviously

22    exposed at this point, because we don't have control

23    over the Open Reach server, which is again is, it's the

24    firewall that we utilize to be able to protect ourselves

25    against any hacker, if you would.  But, unfortunately,

1    as you can see here, in this particular case they are

2    inside of my firewall, so there's nothing I can do.

3        I am protecting against the outside of the

4    firewall, but I cannot protect them from being inside my

5    virtual private network, which is they have access to

6    the whole world, for that matter, for every computer

7    that we own.

8    Q.   Do the defendants have -- have the defendants

9    locked the computer communications room?

10   A.   Yes.  When I was allowed to finally get into the

11   room I had people from their security group really, they

12   wouldn't let me do anything basically, they just were

13   with me at all times, so they were like four or five

14   people with me and they wouldn't let me do anything, and

15   they only allowed me to go in there for about ten,

16   fifteen minutes.

17   Q.   You have been at the hotel now for about eight

18   weeks you said?

19   A.   Yes.

20   Q.   Is that room guarded with security guards of the

21   defendants?

22   A.   Yes, like five to six, seven people in there all

23   the time, at all times.

24            MR. RODRIGUEZ:  No further questions, Judge.

25            THE COURT:  Cross-examination.

35

CROSS-EXAMINATION

BY MR. PITTMAN:

Q.    Sir, you stated that the defendants have accessed the Four Seasons network improperly.  What dates were those accesses, did they occur?

A.    I don't remember the dates exactly, but I have a complete report that I think I can share with you. Basically it has been at different times, different hours, but it usually is during the night.

Q.    And what was accessed in these different times?

A.    Just the virtual private network, which is pretty much wide open to anything they like to do.

Q.    But do you actually know what they did or they were just connected to the network?

A.    They were connected into the virtual private network, which is Four Seasons' network, which basically we do not allow that to happen from the very beginning, so they are doing it anyway, so...

Q.    But you say they are connected to the network, they are connected to the virtual private network, can you tell me specifically what they are doing when they are allegedly connected to the network?

A.    Let me see if I can explain this.  Unfortunately at this point --

        MR. RODRIGUEZ:  Judge, we object, that calls

36

1   for speculation.

2         THE COURT:  Overruled.  Go ahead.

3         THE WITNESS:  Unfortunately, when you have a

4   client, you would call a client to be able to connect to

5   a particular piece of software, which in this case let's

6   assume that they want to have access to our financial

7   data, you need a specific line to be able to access that

8   data.

9         When Mr. Eduardo Bencomo left the company he

10  took his computer with him, although it belongs to us,

11  he took it with him, and in that computer he had all the

12  clients loaded, so he can pretty much access the data

13  without me, I don't have no way of knowing it at this

14  point.

15  BY MR. PITTMAN:

16  Q.   So you don't have any evidence that they have

17  accessed any trademark or proprietary information?

18  A.   The fact is that they have the computer with all

19  the clients so they can access it without me actually

20  noticing it or I cannot tell.

21  Q.   You cannot tell?

22  A.   I cannot tell if they access that.

23  Q.   So do you don't have any evidence that they have

24  accessed it?

25  A.   The only evidence I have is that they are inside of

1    the network, inside of our virtual private network.

2    Like I said, you cannot see it.  They have the clients

3    loaded, I won't be able to see it.

4    Q.   So in the complaint when it alleges that they have

5    access to client information and preferences and credit

6    card information, do you have any evidence that any such

7    material has been accessed or copied or in any other way

8    misappropriated?

9    A.   The only thing that I can possibly say is that they

10   spent many hours inside of the network because you can

11   actually monitor this during the night.  The fact that

12   they have this client thing, it's kind of like

13   impossible to know what they have done, because they can

14   actually access the data and disconnect without any

15   trace, for that matter, because they are inside of my

16   firewall.  So it's impossible.

17   Q.   So it could be that there are computers connected

18   that are just, that aren't even functioning, no one is

19   doing anything at those terminals?

20   A.   No, there is activity.  There's plenty of packets

21   being sent through the network, everything that is

22   basically monitored by packets.  When you send so many

23   packets you know there's data being transferred back and

24   forth.  And there's zillions of packets being sent back

25   and forth so you know there's something going on.

38

1   Q.   Does your private network have internet access?

2   A.   The network, it has a get-away after the firewall,

3   so the activity that we see within the network is inside

4   of my firewall, which is Open Reach.  Outside the

5   firewall there is no activity whatsoever.

6        At this point basically all the traffic that has

7   been generated by whatever is going on with those

8   computers has been generated inside my firewall, so it

9   is indeed a lot of activity with packets being sent and

10  air messages and all kinds of traffic.

11  Q.   And all of these computers that are listed on this

12  chart, none of them belong on your network?

13  A.   No.  We don't use that IP addressing; nevertheless,

14  we don't use those names, as you can see.  They

15  belong -- the way you can tell who is, in the network,

16  is by using a protocol which is called DNS.  I am pretty

17  sure you know about that.  The DNS will convert the IP

18  addressing into naming conversion.  That's how you can

19  actually tell what computers are on your network.

20  Q.   Is it possible that, if there are two computers

21  connected on that network, is it possible for those

22  computers to communicate with each other?

23  A.   Those communicate each other?

24  Q.   Yes.

25  A.   Yes.

1    Q.    So could it be that those packets that are being

2    sent back and forth are being sent back and forth

3    through those computers?

4    A.    No.  The reason you can tell is, basically when you

5    have a computer activity, you can actually monitor it by

6    pinging that computer only, ping the computer and tell

7    the packets where they have been sent to.  If they were

8    between each other, I wouldn't be worried, to tell you

9    the truth.

10         The concern that I have is basically because of the

11   fact that those, with several terminals, including like

12   Eduardo's or some of those people that I don't even

13   know, they send the packets to inside the network that

14   we have, which is called CCSA, CCS Fidelio is the one

15   that actually carries the CIS/CRS activity, and at that

16   point we know for a fact there's come activity but we

17   just don't know what it's doing, but we can certainly

18   see the packets being sent back and forth between the

19   two systems.

20   Q.    In the TRO it refers to NetBEUI as being a hacker

21   program.  Is this correct?

22   A.    No.

23   Q.    What is NetBEUI?

24   A.    NetBEUI is just a protocol, just a simple property

25   protocol to be able to see, it's like WINS or DNS,

1   basically it allows you to see the computer structure

2   within a network.

3       Four Seasons Caracas and many other properties

4   have, just for several years now, they have actually

5   prohibited any property from having the protocol loaded

6   in any computer for that matter.  They just don't want

7   the employees to be able to see each other.  That's what

8   they do.  They are trained to avoid it, that's all.

9   Q.   Do you know if NetBEUI resides on most if not all

10  Windows computers?

11  A.   No, none.  Basically what we do is we go computer

12  by computer, we have some piece of software that is

13  called host, what we do is we host the network and we

14  make a copy of an identical network in every single

15  computer, and we make sure that all of those protocols

16  are not loaded at the time.  And of course, you know,

17  it's actually written in my policy agreement, the

18  digital policy agreement that we have, and we make the

19  employee sign.

20  Q.   Is NetBEUI on Windows itself?

21  A.   Uh-huh, in every Windows, yes.

22  Q.   Do you know, sir, if it's possible to change one's

23  DNS entry or IP number?

24  A.   Yes, you can change it.

25  Q.   So there's no way to know for sure that the IP

41

1  addresses and the DNS entries that are listed on this

2  chart are accurate?

3  A.   Well, I know they are accurate.

4  Q.   How do you know they are accurate?

5  A.   Because I called the provider.  The provider is Net

6  One in Venezuela.  And they told me they belonged to

7  Consorcia Barr.

8  Q.   And if I were, for example, a hacker and I wanted

9  to, or not a hacker, if I was just a person that wanted

10  to alter my appearance, would it be possible for me to

11  change my IP address?

12  A.   Yes, you could.  But I would still be able to see

13  it.  If it isn't within my mask, we use a specific

14  masking within the network, and we use 255, 25500, if

15  for any reason you decide to change your IP addressing

16  or even the name of the computer, I would be able to see

17  it.

18      But we don't see that.  We only see those

19  particular computers which for a fact we know that they

20  don't belong to us.  Even if they changed the name, it

21  still is part of their network.  They are not inside of

22  our network because they don't belong to us and neither

23  are the IP address or the naming or the Hicks control

24  for every MAC card that they have.

25  Q.   But if someone changed their IP address to appear

42

1  as someone else, how would you know that wasn't the

2  case?

3  A.   Let's assume for the minute that, yes, indeed they

4  can change it, but I can tell by the MAC address of the

5  network card that that computer does not belong to me.

6  Q.   I understand that.  But how could you tell from

7  looking at the MAC address that belonged to any of these

8  individuals, two individuals that you have identified on

9  this chart?

10  A.   Every time you do a ping with a route, per se, you

11  can actually see the actual name of the computer with

12  the MAC address of the PC.

13  Q.   But what if someone changed it?

14  A.   They can change the name but I can still see the

15  MAC address of that computer.

16  Q.   There's no way to change the MAC address?

17  A.   Never.  It's totally impossible.

18  Q.   What if the MAC address had always been changed or

19  if the IP, or the DNS entry had always been changed, how

20  would you know that MAC address was ever the correct MAC

21  address?

22  A.   No.  The MAC address resides inside of the chip,

23  inside of the network card.  There is no way you can

24  ever change that.

25  Q.   I understand that, sir.  But if you had a MAC

43

1    address number of one and you associated with an

2    individual, let's say the first individual on this

3    chart, but that individual's name, someone else was

4    purporting to be that individual, and, as you have told

5    me, you have monitored it on a few occasions, isn't it

6    possible that on those few occasions that you monitored

7    it on that someone was pretending to be this person and

8    you have always, if you have always referred or

9    associated a certain IP address with a certain MAC

10   number, there would be no way to tell, would there,

11   whether that was the MAC address of any given person?

12   A.    We have a complete detail, the particular software

13   that we use to monitor the network comes included with

14   three com, to be able to manage the network.   That

15   particular piece of software allows you to give your

16   complete inventory of everything that is residing within

17   your network, along with IP addressing, name of

18   conversion or even the MAC address for every computer.

19        As you know, MAC address is unique in the world for

20   every single network card.   So, say, assume that they

21   changed the name or the IP address.   I can still see the

22   MAC address in that computer.   So I can locate anybody

23   in the internet anywhere in the world just by the MAC

24   address.

25        Even if you changed your entire identity in the

44

1   world, you can actually ping somebody just by looking at

2   the actual MAC address of the card.  We know what

3   belongs to us because we have a complete inventory of

4   the MAC addresses.

5   Q.   I understand that.  But you don't know what belongs

6   to other people?

7   A.   I can tell that, for instance, say I ping 5522, I

8   can tell exactly that it belongs to that person, and I

9   also know that I can see the MAC address of the card.

10  Q.   Do you have an inventory of everyone else's MAC

11  address?

12  A.   No, I do not.

13  Q.   So you don't know what computers belong to what MAC

14  address?

15  A.   No.

16          MR. PITTMAN:  Thank you.

17          No further questions, Your Honor.

18          THE COURT:  Do you have any redirect?

19          MR. RODRIGUEZ:  Yes, Judge.

20                  REDIRECT EXAMINATION

21  BY MR. RODRIGUEZ:

22  Q.   Dr. Venegas, you mentioned that you detected the

23  transfer of data packets from the network to these

24  computers?

25  A.   Yes.

1    Q.   How frequently have you detected access or

2    unauthorized access by these computers into the network?

3    A.   I don't exactly know the dates.  I probably have it

4    in my reports.  But we had a budget meeting not too long

5    ago, and it happened almost every day last week, almost

6    every day between 3 o'clock in the morning and just

7    different hours, different times.

8    Q.   Is that access of these computers that you have

9    identified belong to the defendants, is it continuing

10   today?

11   A.   Yes.

12   Q.   Now, when they access the Four Seasons network,

13   they're in --

14   A.   Uh-huh.

15   Q.   -- do they have access, can they access, for

16   example, the back office which contains all the

17   financial office of Four Seasons?

18   A.   Sure they can, yes.

19   Q.   And is back office proprietary to Four Seasons?

20   A.   Yes, it is.

21   Q.   In fact, isn't that the software that Four Seasons

22   developed itself?

23   A.   They developed it around 13 years ago, yes.

24   Q.   Once you are in the Four Seasons network, you

25   mentioned in your affidavit that there's a program that

46

 1   Four Seasons uses called Fidelio?

 2   A.    Yes.

 3   Q.    And I believe you mentioned it was front office,

 4   that's like the guest histories and stuff like that?

 5   A.    Yes, it is.

 6   Q.    Is that software also proprietary to Four Seasons?

 7   A.    It is unique to Four Seasons because it was

 8   developed specifically to fit our needs.  Basically it's

 9   a shell created for Four Seasons, yes.

10   Q.    So once you are in the network you can access that

11   proprietary software?

12   A.    Oh, yes, it's wide open.

13   Q.    You also mentioned I believe micros?

14   A.    Yes.

15   Q.    What does that do?

16   A.    It's the point of sale of software and hardware

17   created by micros.

18   Q.    Describe for me what point of sale is.  I'm sorry.

19   A.    Basically it's in every single outlet.  That's kind

20   of like a cash register, if you would.

21   Q.    So it's a computer at each, at the restaurant, at

22   the bar, at the hotel, and it records the sales?

23   A.    Every single sale in the hotel.  Every outlet has

24   one.

25   Q.    That is software on the Four Seasons network

1    proprietary to Four Seasons?

2    A.    Yes, it is.

3    Q.    So once they have access to the network they also

4    have access to that?

5    A.    Not only that property, for that matter, they have

6    access to every single property in the world.  It's all

7    interconnected by our -- it's a wide area network.  So

8    you can access any property, for that matter, even the

9    one here in Florida.  It doesn't matter.  It's available

10   to them.

11   Q.    In your affidavit, one last point, in your

12   affidavit you mentioned on cross-examination there was a

13   question as to hacker, you, you mentioned in your

14   affidavit a program called Lafarack (phonetic)?

15   A.    Uh-huh.

16   Q.    What is that?

17   A.    That's a piece of software, it's just available in

18   the internet, you know, just like any other piece of

19   software.  It's a hacker's program.  And that particular

20   program is used to randomly access the network and be

21   able to access the user name and password for every

22   computer.  That was located in, of course, in Eduardo's

23   computer.  That's when we really got panicked about the

24   whole thing.

25   Q.    You found that in Eduardo Bencomo's computer?

48

1   A.   Yes.  And probably it's still there.  If we go to

2   his computer today, it's probably still there.

3   Q.   By accessing the Four Seasons network, does that

4   also allow somebody to intercept intercorporate e-mail?

5   A.   Say that again.

6   Q.   When you have access to the Four Seasons network

7   does that also allow you to intercept e-mail?

8   A.   Uh-huh, it does.

9   Q.   Okay.  You mentioned in your affidavit that that

10  was the first problem that you addressed when you went

11  down to Caracas?

12  A.   Indeed.  That was my first priority.

13  Q.   And how have you resolved that issue?

14  A.   We had to basically go through the maximum security

15  measures that you can possibly allow with, within Lotus

16  Notes, in encrypting every single computer, every single

17  e-mail client, with a specific key for that particular

18  person and signature to be able to encrypt the data.

19  Q.   Prior to your encrypting all the e-mail at the Four

20  Seasons, were you able to confirm that the defendants

21  were intercepting the e-mails at the hotel?

22  A.   Yes.

23           MR. RODRIGUEZ:  Thank you.

24           THE COURT:  Thank you, sir.

25           Okay, any more evidence?

 1          MR. RODRIGUEZ:  No, Judge.

 2          MR. CAREY:  No, Your Honor.  We do have some

 3    brief legal argument if the Court has time.

 4          THE COURT:  All right.  Do you plan to present

 5    any evidence today?

 6          MR. PITTMAN:  No, Your Honor, I haven't had an

 7    opportunity to gather any evidence.

 8          THE COURT:  Okay.  Let's hear then your

 9    argument.  Why don't you ask that they be directed to

10    return the computers?

11          MR. CAREY:  Your Honor, we have proposed in

12    the order that we submitted that they be enjoined from

13    continuing to deny us access to the computers.  A

14    mandatory injunction order directing them to

15    affirmatively hand it over would actually be our

16    preference, Judge.

17          Your Honor, I would like to just run through a

18    couple of the legal standards to sort of narrow our

19    argument for the Court.  We are required to show, to

20    obtain the injunction that we have requested, a

21    likelihood of success on the merits, and there are three

22    legal theories that are presented by the instant

23    motion.

24          There are additional claims that are in our

25    complaint, and we may at a later date move for a

1   different type of relief related to those, but for the

2   present purposes we are asking for an injunction

3   prohibiting violations of Title 18, U.S.C., Section

4   1030, Title 18, U.S.C., Section 2511 and Florida

5   Statutes, Section 688.

6          The first statute at play here is the Federal

7   Computer Fraud and Abuse Act.  Subsection (A)2(C) of

8   that statute, Your Honor, prohibits, would be a

9   violation of that statute, would be satisfied, and we

10  would be entitled to an injunction if we are likely to

11  show that there has been intentional access by the

12  defendants to a protected computer without authorization

13  and because of that access had obtained information and

14  also that those computers involved interstate or foreign

15  communications.

16         Here the evidence presented both in the

17  affidavits of record and the oral testimony of

18  Dr. Venegas we submit clearly demonstrates that there

19  has been intentional access by the defendants to the

20  Four Seasons computer network, which qualifies as a

21  protected computer under the statute.  "Protected

22  computer" is a defined term, Your Honor.  In Subsection

23  (E) of the statute protected computer is any computer

24  that or computer network that is, that conducts

25  interstate or foreign communications, period.

1          Without authorization, we have had clear

2   testimony that the defendants do not have any

3   authorization to access the Four Seasons network and

4   never had any.  And we have also demonstrated we believe

5   a likelihood of success in showing that defendants have

6   obtained information.

7          Dr. Venegas testified that packets of data

8   have been verified or have been transferred from the

9   Four Seasons network to the defendants' operated

10  computers and that that information consists of e-mail

11  interception, back office financial information and

12  guest information, among potentially other information,

13  and clearly the Four Seasons network does involve

14  foreign communication and the defendants' activities in

15  accessing it constitute foreign communication.

16         Therefore, Your Honor, we believe we have

17  established a likelihood of success in showing a

18  violation of 18 U.S.C., Section 1030(A)2(C).

19         We also believe we can show likelihood of

20  success in demonstrating a violation of Subsection

21  (A)4.  That would require knowing access of a protected

22  computer without authorization and obtaining anything of

23  value.  Again, for the same reasons, we believe that

24  subsection has been violated and we believe we have

25  shown a likelihood of success in demonstrating that

1    violation.

2            And, finally, under this particular Computer

3    Fraud and Abuse Act, we believe there is a likelihood of

4    success on the merits with respect to Subsection (A)5(C)

5    which would prohibit potential access without

6    authorization where damage is caused.  With respect to

7    damage, the case law covers several things.  Damage has

8    been found in the In Re:  America Online case that was

9    decided by Judge Gold of this District in April of this

10   year.

11           That damage would include time and effort

12   spent by the technical staff of an aggrieved party in

13   trying to deal with the problems caused by the

14   defendants.  Dr. Venegas specifically testified to that

15   in this hearing.

16           Additionally, damage we believe is constituted

17   by the potential loss of customers.  Four Seasons is the

18   preeminent global luxury brand in the hotel and

19   hospitality industry and there is a serious threat that,

20   if the defendants were to sell or otherwise disseminate

21   its customer information, its guest preferences, that

22   that would lead to a potential loss, a significant

23   potential loss of customers for Four Seasons worldwide.

24           And that element, Your Honor, potential loss

25   of customers, was recognized as a component of damage

53

1    under this statute specifically in the Register.com

2    versus Verio decision that's cited in our motion.

3          Next Your Honor, we want to address 18 U.S.C.

4    Section 2511, which shortly and simply is another

5    criminal statute which also provides a private cause of

6    action for aggrieved parties.  That one prevents any

7    intentional interception of any electronic

8    communication.

9          We have put forth evidence in the affidavit

10   and in the hearing today that the defendants have

11   intercepted the intercorporate e-mail systems of the

12   plaintiffs and, therefore, that we are likely to succeed

13   on demonstrating a violation of 18 U.S.C., Section

14   2511.  The private cause of action for that statute,

15   Your Honor, is set forth in 18 U.S.C., 2520.

16         And, lastly, for purposes of this motion we

17   believe we are likely to succeed on our claim under

18   Florida Statute 688, Ec Sector, which is the Florida

19   Trade Secrets Act, which Florida has adopted the Uniform

20   Trade Secrets Act.

21         The customer information, guest information,

22   guest preferences, as well as our confidential business

23   information, financials and other sales information, are

24   trade secrets, and the cases are legion to that effect,

25   that that type of information qualifies as a trade

54

```
 1   secret.
 2            Under Statute 688.003, any threatened
 3   misappropriation of a trade secret, even if an actual
 4   one isn't shown, any threatened misappropriation is
 5   specifically authorized for injunctive relief.  And,
 6   therefore, we believe that we are likely to succeed on
 7   that claim and injunctive relief is strongly warranted.
 8            The next factor that we are obligated to
 9   demonstrate before Your Honor is that we will suffer
10   irreparable injury.  We believe that we have satisfied
11   this showing by demonstrating the potential loss of our
12   trade secret information and the threat of loss to our
13   customers in goodwill which the courts recognize as
14   irreparable injury.
15            We are also -- the third factor for the Court
16   to consider is the balance of the hardship.  The
17   plaintiffs have a lot at stake here.  The hacking is
18   continuing.  And we risk losing a lot of valuable
19   information and goodwill and the like.  Defendants, on
20   the other hand, have never been authorized to access our
21   computer network and have no legitimate interest that
22   would be, that would outweigh plaintiffs' interests
23   here.
24            In fact, I would quote to the Court, in the
25   YourNetDating case, which is cited in our brief and
```

55

1   which also arose under the computer fraud statute where

2   the Court there indicated the defendants had no, quote,

3   honest business in hacking the plaintiff's system and

4   therefore easily found that the balance of hardships

5   tipped in favor of the plaintiffs in that case, as we

6   suggest it does clearly here, Your Honor.

7         And lastly, public policy.  Both 18 U.S.C.

8   1030 and 2511 are criminal statutes.  Congress has seen

9   fit to criminalize this type of behavior.  We believe

10  that there are important privacy concerns.  We also have

11  important privacy concerns of individual customers and

12  guests of the plaintiffs' hotels at issue here.  There

13  is no competing public policy interest that the

14  defendants could muster here.

15        And, therefore, we believe we have established

16  all the factors that are prerequisite to preliminary

17  injunctive relief and we would respectfully request that

18  Your Honor grant us such relief as practical.

19        Lastly, I would like to address the issue of

20  bond.  The Court has a discretion whether to require a

21  bond or not.  It has the discretion not to require any

22  bond.  Since there is no possibility of harm here to the

23  defendants if they are simply enjoined from not hacking

24  the Four Seasons network and stealing our trade secrets,

25  we would respectfully suggest to the Court that no bond

1   is warranted and, indeed, that is exactly what the judge

2   in the YourNetDating case --

3        THE COURT:  Which case is that?  And where is

4   your memo?  Do we have a copy of -- I don't have that in

5   my materials here.  Let me make sure I have that cite.

6        MR. CAREY:  I have a copy which I could

7   provide the Court of the memo.

8        THE CLERK:  That's not necessary.

9        THE COURT:  Okay.

10       MR. CAREY:  The YourNetDating case, it's cited

11  in our brief at page 11.  The cite for the case is 88

12  F.Sup, I believe it's a typo, probably should be F.Sup

13  Second, 870, Northern District of Illinois, for the year

14  2000.

15       THE COURT:  Okay.

16       MR. CAREY:  And inasmuch as --

17       THE COURT:  Why can't y'all just -- seems

18  like, if you are running the hotel, you have some

19  leverage.  Why can't you just discontinue operations if

20  they don't give you your access to the computers or give

21  you the computer back?

22       MR. CAREY:  Your Honor, they have found an

23  ability in a way to hack into the corporate network.

24  Even if we were to shut down the entire hotel, the

25  defendants could still access the network from other

57

 1    points.  So I don't believe that would be a practical

 2    resolution.

 3         We have attempted, Mr. Venegas has been in

 4    Caracas for eight weeks trying to resolve this problem,

 5    and he's described the resistance he's received from the

 6    defendants, and unfortunately we are at a point where

 7    the judicial redress may be our only effective way of

 8    dealing with it.

 9         THE COURT:  If I were going to order return of

10    that equipment, what would I say, defendants shall

11    return to the custody of the plaintiffs, what, within 48

12    hours of this order, the computer equipment owned by the

13    plaintiffs, is that what you would want?

14         MR. RODRIGUEZ:  The Open Reach server and the

15    backbone, Judge. .

16         THE COURT:  How about that computer you say

17    the fellow took?

18         MR. CAREY:  Mr. Bencomo's work station.

19         THE COURT:  Okay.  Describe that again.  The

20    backbone?

21         THE WITNESS:  Yes, backbone, it's the backbone

22    and the Open Reach server.

23         THE COURT:  Backbone and Open Reach server.

24         DR. VENEGAS:  And the work station that

25    Eduardo Bencomo has taken from us.

1          MR. PITTMAN:  Your Honor, for the sake of

2     clarity, I am not sure I know what a backbone is.

3          DR. VENEGAS:  It's a switch, it's a three com

4     switch, where you can plug in all the ports.

5          THE COURT:  What is it?  How would you

6     describe the equipment?  Other than backbone, what would

7     you call it?

8          MR. RODRIGUEZ:  It's called a three com

9     switch.

10          THE COURT:  Three com switch?

11          MR. RODRIGUEZ:  Right.

12          DR. VENEGAS:  Yes.

13          THE COURT:  Okay.

14          MR. CAREY:  There's a three com switch,

15     there's the server, and there's Bencomo's work station.

16          DR. VENEGAS:  Right, Open Reach server.

17          MR. CAREY:  Open Reach server.

18          THE COURT:  Okay.

19          All right, Mr. Pittman, what is your

20     position?

21          MR. PITTMAN:  Your Honor, again this has been

22     a limited appearance in what I would -- I feel almost

23     ambushed.

24          But, given that this is a TRO, the first thing

25     I would like to say is that I don't think they are

1   likely to succeed on the merits for the jurisdictional

2   reasons that we have raised, which, as we pointed out,

3   most of the counts in the contract certainly in no way

4   should be in Miami, if any.  I haven't had a chance to

5   analyze the agreement, so I won't go any further into

6   that argument.

7          Second, the gravamen of this complaint, to the

8   extent that I have been able to digest it, is that

9   there's this fraud going on, that we're allegedly

10  misappropriating information and hacking into their

11  system.  Rule 9(b) requires specificity in any case

12  where fraud is pled.  The complaint, if you look at it,

13  contains no specificity.

14         Typically, cases interpreting specificity with

15  fraud require the who, what, when.  We don't know when

16  these -- there's no allegation in the complaint when

17  these breaches allegedly occurred.  The defendants have

18  stated they have no evidence of what allegedly was

19  accessed or, in fact, if there was any, quote, hacking

20  occurring.

21         Instead, what we believe is this is a pretext

22  to interfere with legitimate claims by my client, by the

23  owners of the structure, who are entitled to financial

24  reports from the plaintiffs, the management company.

25  They are entitled to all of the money and financial

60

1 reports to show that they are getting all of the money.

2   And the plaintiffs are not complying with this

3 request, they are stonewalling us, and they are using

4 this to create some appearance in Venezuela that we are

5 hacking their system and trying to steal information

6 that has no interest to us.  I think --

7   THE COURT:  But if you are not, why wouldn't

8 you turn over this equipment to him and give him access

9 to the computer room?

10   MR. PITTMAN:  Well, I believe the expert

11 testified that he was allowed access to the computer

12 room.  And, Your Honor, quite frankly, I would love to

13 have affidavits here to address the claims they have

14 made, but I have not been given enough time.  I have had

15 less than a day.  And I spent all morning at the

16 doctor's office.

17   THE COURT:  Okay.  It is short notice,

18 although you were provided notice, and so, and given the

19 nature of the allegations, I think the notice is

20 adequate.

21   I am going to enter a preliminary injunction

22 order and we will enter it -- well, I want it effective

23 immediately, but I am probably not going to issue the

24 written order until tomorrow morning, because we need to

25 do some work on the proposed findings that you have,

1   because I think I need to couch it in terms of a

2   likelihood of success on the merits rather than -- I

3   mean, basically, the proposed findings are that I

4   conclude that they violated the law.

5           Certainly, it appears from the evidence and

6   the findings I can make at this point that there's a

7   likelihood of success on the merits.  I am not prepared

8   to reach final conclusions on those points.  I do think

9   that, because of the really criminal aspects of the

10  allegations, that, if there is something going on, your

11  clients ought to stop it immediately.

12          I mean, there's clearly a question of, I hate

13  to enter injunctions that I can't enforce, and it's not

14  entirely clear to me if these people are in Venezuela

15  how I can enforce it, but if there is an unauthorized

16  access to a computer system being undertaken, it's a

17  very serious allegation, and I would certainly seek to

18  enforce my order.  And I hope we don't get to the point

19  of trying to figure that out.

20          It seems to me that there may be a commercial

21  dispute between the parties and, you know, that it will

22  come out however it comes out, but if there is

23  unauthorized access to a computer system, that is a

24  pretty serious problem, and if it's happening it ought

25  to stop immediately.  And I intend to try to enforce,

62

1   take steps to the degree I can, to enforce the order.

2   So we will enter it.

3        I am inclined not to order a bond and I -- the

4   Eleventh Circuit has supported that if I make the

5   necessary findings.  You may be, I mean, it may be

6   advisable to take that issue out with a fairly, I can't

7   imagine that the amount of the bond would need to be

8   very sizable, that may be something you could consider.

9        I have looked at it in the past, and it seems

10  to me there are some case that say, you know, as long as

11  you make some findings as to the lack of necessity of a

12  bond, that is adequate.  The case law is a little mixed

13  in that area.  So tell me what you want me to do on

14  that.

15       MR. CAREY:  Your Honor, plaintiffs would be

16  amenable to posting a nominal bond and we could,

17  Mr. Venegas has indicated that the value of the computer

18  equipment that is being used by the defendants is

19  approximately $30,000, and we would be happy to post a

20  bond in that amount if the Court determines it's

21  appropriate.

22       THE COURT:  All right.  I will order then a

23  $30,000 bond.  And, as I say, we will get this order out

24  as promptly as we can in the morning.

25       But, Mr. Pittman, I think you ought to advise

1   your client of the decision of the Court.  And it's my

2   intention that the requirements be effective immediately

3   so that any access to their system ought to stop

4   immediately.  And the time is running in terms of

5   turning over to them any equipment, the items that they

6   mentioned, the work station, the backbone and the

7   server, at least to their custody.

8           Whether or not you have to physically deliver

9   it to them, I'll leave that to y'all, but at least it

10  needs to be in their custody, where they have sole

11  control of it.  It may be such that, if y'all could work

12  it out, you don't need to remove it from the room.  But

13  that is -- I don't know how hard that is to do.

14          Anything else today then?

15          MR. CAREY:  No, Your Honor.

16          THE COURT:  Okay, I am going to enter the

17  order.  Again, y'all need to let me know about this, if

18  you have any, talk it over with your client, the issue

19  that I generally do not hear Steel Hector cases.  That

20  is something y'all need to decide.

21          As I say, it's not a -- it's a practice I've

22  adopted, but it's not a bar, but you need to know about

23  it, and I certainly don't have any problem stepping out

24  of this case if your client has any concern about that.

25  I don't know that Steel Hector's client has a voice in

64

1    it.  But, you know, y'all need to at least think about

2    it.

3            Okay, anything else today?

4            MR. CAREY:  No, Your Honor.

5            THE COURT:  All right, have a good evening.

6            (Hearing concluded.)

7

8

9

10              C E R T I F I C A T E

11

12           I, Roger Watford, Official Court Reporter, do

13   hereby certify that the foregoing transcript is true and

14   accurate to the best of my knowledge, skill and ability.

15           Dated this ___ day of _____,

16   2001

17

18                              _____

19                              Roger Watford

20

21

22

23

24

25